## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **NTGSH JV, LLC and NEW TECH** | § | **Civil Action No.** _____ |
| **GLOBAL VENTURES, LLC,** | § | |
| *Plaintiffs* | § | |
| | § | **Emergency Relief Requested** |
| **v.** | § | |
| | § | |
| **RAJMON WILLIAMS, STEVE** | § | |
| **BIGGS and RIGUP, INC.,** | § | |
| *Defendants.* | | |

### PLAINTIFFS' VERIFIED ORIGINAL COMPLAINT AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs NTGSH JV, LLC and New Tech Global Ventures, LLC (collectively, "Plaintiffs"), by their undersigned counsel, hereby file the following Complaint seeking a Temporary Restraining Order ("TRO"), Preliminary Injunction, and damages against Defendant Rajmon Williams, Defendant Steve Biggs, and Defendant RigUp, Inc. (collectively, "Defendants"). Plaintiffs seek injunctive relief to preserve the status quo ex ante pending litigation of their claims. Plaintiffs' grounds for a TRO are also set forth in their Motion for a Temporary Restraining Order, filed contemporaneously with this Complaint.

1.      This action arises out of the theft of highly confidential trade secret information belonging to Plaintiffs by Williams and Biggs, shortly before they quit their jobs and joined one of Plaintiffs' competitors (RigUp), and then the delivery of that information to RigUp, where it is being used to unfairly compete against Plaintiffs. While the full extent of the theft is still being investigated, it is clear that Williams and Biggs stole at least a highly confidential list of consultants, including names, addresses, expertise, and, perhaps most importantly, profit margins, which would allow Defendants to unfairly compete by underbidding Plaintiffs in an effort to convince the consultants to leave Plaintiffs and send their business to RigUp. The theft of

1

Plaintiffs' trade secrets and the willing and knowing acceptance of the same by RigUp appears to be part of a larger pattern of RigUp resorting to unlawful business practices to gain an unfair competitive edge.  *See Sierra Hamilton, LLC v. RigUp, Inc.*, No. D-1-GN-19-000141, pending in the District Court of Travis County, Texas, 261st Judicial District. Without immediate judicial intervention restoring the status quo and undoing the irreparable effects of Defendants' theft (as much as can be done, at least), Plaintiffs face the irreparable harm of having their trade secrets used against them in the marketplace to damage their goodwill and business relationships.

## I.    PARTIES

2.      NTGSH JV, LLC is a joint venture between New Tech Engineering L.P., a Texas limited partnership, NTE Holdings, LLC, a Texas limited liability company, and Sierra Hamilton Holdings Corporation, a Delaware corporation.

3.      New Tech Global Ventures, LLC is a Texas limited liability company and, as of July 1, 2020, is a subsidiary of NTGSH JV, LLC.

4.      Defendant Williams is an individual who has his domicile in Milliken, Colorado. Defendant Williams may be served at 206 S. Marjorie Ave, Milliken, Colorado 80543 or wherever he may be found.

5.      Defendant Biggs is an individual who has his domicile in Thornton Colorado. Defendant Biggs may be served at 13346 Kearney Street, Thornton, Colorado 80602 or wherever he may be found.

6.      Defendant RigUp is a Delaware corporation whose principal place of business is in Austin, Texas.  Defendant RigUp can be served by and through its Registered Agent for Service of Process, Cogency Global, Inc., 1601 Elm St., Suite 4360, Dallas, Texas 75201.

## II.     JURISDICTION AND VENUE

7.     This Court has personal jurisdiction over RigUp because RigUp is domiciled in Texas, transacts business in Texas, and has its principal place of business in Texas.

8.     This Court has personal jurisdiction over Defendants Williams and Biggs because, inter alia, they each have numerous contacts with Texas related to the allegations herein and their tortious activity was directed at the state of Texas.

9.     This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1331, as Plaintiffs assert claims that arise under the laws of the United States, namely the federal Defend Trade Secrets Act, 18 U.S.C. § 1836, and the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030. The Court also has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to Plaintiffs' federal-question claims that they form part of the same case or controversy.

10.     Venue in this district is proper under 28 U.S.C. § 1391.

## III.     FACTS

**A.     The Oilfield Project Management and Consultancy Business.**

11.     Prior to July 1, 2020, New Tech Global Ventures, LLC ("New Tech") and Sierra Hamilton Holding Corporation ("Sierra Hamilton") were each in the oilfield project management and consultancy business.

12.     RigUp is also in the oilfield consulting business and is a competitor of New Tech, Sierra Hamilton, and NTGSH.

13.     As relevant to the instant dispute, the oilfield consulting business involves providing services to two groups: oil and gas exploration and production companies (sometimes

3

called "operators") and individuals/small business owners with expertise in various aspects of the drilling, completions, and production processes for oil and gas (sometimes called "consultants").

14.      Oilfield consulting businesses, such as New Tech and Sierra Hamilton act as a sort of economic go-between or middleman between operators and consultants, providing valuable services to both operators and consultants from their offices in Houston.  The operators and consultants work directly together in the field to accomplish drilling, completions, and production projects.

15.      New Tech and Sierra Hamilton each maintain contractual relationships with thousands of operators and consultants.  Having these stable business relationships in place allows New Tech and Sierra Hamilton to most effectively provide services to both operators and consultants.  These relationships also allow New Tech and Sierra Hamilton to effectively compete against other oilfield consulting businesses (such as RigUp).

**B.      The Relationships Amongst Oilfield Consulting Businesses, Operators, and Consultants**

16.      Operators often do not have in-house personnel with the necessary skills, experience, and expertise to provide services on a particular project.  In such a case, operators may ask oilfield consulting businesses (such as New Tech or Sierra Hamilton) to identify potential consultants with the various qualities the operator wants for that project.  For example, an operator may need a drilling supervisor (sometimes called the "company man") for a deep-well directional drilling project in the Eagleford shale oilfield, or a completions supervisor (also, a "company man," but for a different part of the process) for a fracking project in the D-J Basin in Colorado.  New Tech or Sierra Hamilton may have a pre-existing relationship with several consultants who do have those skills, and can make referrals to the operator.

17.     Similarly, consultants who are looking for projects may contact New Tech or Sierra Hamilton to try to identify opportunities with operators that the consultants may not otherwise know about. If New Tech or Sierra Hamilton is aware of such projects, they may try to "match" a consultant to an operator with a need.

18.     Even if a particular operator already knows of a specific consultant they want on a project and the "match" has already been made, oilfield consulting businesses like New Tech and Sierra Hamilton still provide valuable services to both the consultant and the operator.

19.     New Tech and Sierra Hamilton maintain master service agreements ("MSAs") with hundreds of operators.  Having the oilfield consulting business involved in the engagement of a consultant allows the operator to easily apply the pre-existing MSA to that engagement, rather than having to negotiate/execute a new MSA specifically with that consultant, which would be time consuming and costly for the operators.

20.     In addition, many operators, especially large ones like Exxon or Chevron, have specific rules for the submission of invoices to them and/or require that an invoice be submitted through a particular software system.  New Tech and Sierra Hamilton each employ individuals who are experts in these rules, software systems, and the process of submitting invoices so that they are timely paid.  This allows operators to receive timely, uniform, and compliant invoices, which would not happen if each consultant submitted his or her own invoice.

21.     New Tech and Sierra Hamilton receive invoices from consultants, process them, and submit them to the operators.  Economically, New Tech and Sierra Hamilton typically pay consultants for their invoices before receiving payment from the operator, thereby relieving the consultant of the risk of delayed payment by the operator.

22.     In addition, New Tech and Sierra Hamilton maintain insurance policies that cover work done by consultants during a particular engagement and that generally satisfy the requirements of operators' MSAs.  This relieves consultants of the burden of having to find and maintain their own liability insurance policies for each operator with whom they work.

23.     In exchange for their services to both operators and consultants, oilfield consulting businesses (like New Tech and RigUp) are paid a fee typically calculated as a percentage of the amount an operator is willing to pay for a consultant's services.  This is sometimes called the "split".  For example, an operator may be willing to pay $1,000 per day for a drilling supervisor, and a particular drilling supervisor may have agreed to a 90/10 split with New Tech.  This means that the drilling supervisor would send an invoice for $900/day to New Tech, New Tech would pay the consultant $900/day, and then would bill $1,000/day to the operator.  The extra $100/day would be New Tech's compensation for the various services to the consultant and operator described above.

24.     The split can vary from consultant to consultant, and is often the result of individualized negotiations, personal relationships, and goodwill formed between the consultant and the oilfield consulting business.

25.     All things being equal, a consultant will receive more money by sending his invoices to an oilfield consulting business that gives him a 90/10 split than from one that gives him an 85/15 split.  Thus, notwithstanding efforts to maintain relationships with consultants, it is common for consultants to switch from sending their invoices from one oilfield consulting business to another based on the split.

**C.      Relationships Between Consultants and Consulting Businesses**

26.      There are a number of businesses who compete in the oilfield consulting space, including New Tech, Sierra Hamilton, and RigUp.

27.      Each oilfield consulting business tries to maintain positive relationships with consultants so that a consultant, if given the choice, will choose to send his invoices to them rather than their competitors.  And, quite simply, the more invoices an oilfield consulting business is able to process, the more revenue it can generate from splits.

28.      New Tech and Sierra Hamilton each employ dedicated business development employees whose job is to create, build, and maintain positive relationships with consultants and operators.  Defendants Williams and Biggs were employed by Sierra Hamilton in business development roles.

29.      The business development employee (including Williams and Biggs) represents the primary point of contact between a consultant in the field and the oilfield consulting business that processes and pays his invoices.  The business development employee discusses and attempts to resolve any issues the consultant may have related to payment of invoices, negotiations of splits, reimbursement of expenses, or finding alternative or upcoming projects.  Business development employees also try to "match" consultants with operators who have projects with particular needs.

30.      New Tech and Sierra Hamilton each maintained highly confidential lists of consultants and operators with whom they had worked before July 1, 2020.  These lists contained consultants' names, contact information, locations, experience, operators they'd worked with, and splits they had agreed to.  Business development employees at New Tech and Sierra Hamilton (including Williams and Biggs) create, update, and use these consultant lists in their efforts to maximize the number and value of invoices sent to New Tech or Sierra Hamilton for processing.

7

31.     Having ready lists of consultants with pre-existing relationships allows an oilfield consulting business to quickly identify potential matches between operators and consultants, or to quickly handle the administrative work of processing invoices on short notice.  New Tech's and Sierra Hamilton's respective lists were created after years of work and investment, and represented significant goodwill developed with the consultants on the list.

32.     These consultant lists are highly confidential and are not shared with any competitors.  Knowing the information on a competitor's list of consultants would allow an unscrupulous competitor to easily and quickly identify which consultants had particular experience, contact only the most promising consultants for a particular project (which may otherwise be difficult), and to most efficiently underbid for the consultant's work by offering a more favorable split.

33.     If a competitor was armed with Plaintiffs' network of consultants, including non-public contact information (such as emails and cell phones), work histories, skills/experiences, and negotiated splits, the competitor could show up on every consultant's doorstep with a tailor-made pitch for the consultant to stop sending his invoices to Plaintiffs and start sending them to the competitor. In such case, Plaintiffs' sales force would be forced to waste time and forego other opportunities in defending its existing and target network from the unfair attack. The damage to Plaintiffs' market position would be devastating as once a market advantage is lost, it is lost.

34.     Accordingly, New Tech, Sierra Hamilton, and NTGSH take significant measures to protect their confidential information about consultants.  These measures include, but are not limited to, storing the information on password-protect computers, limiting access to the information only to those with a business need to know, appending confidentiality warnings to

emails, maintaining confidentiality and nondisclosure employment policies, and requiring certain employees to sign restrictive covenant agreements.

35.     For example, on March 2, 2020, Williams and Biggs received Sierra Hamilton's most recent employee handbook, which contained a Confidentiality Policy, providing as follows: "Employees are required to maintain the confidentiality of internal and external information provided to them or obtained as a result of their employment with Sierra Hamilton or its customers, except when disclosure is required by law or regulation.  Confidential information includes all non-public information that might be of use to competitors or detrimental to Sierra Hamilton or its customers if disclosed."

**D.     Plaintiff NTGSH -- a New Tech/Sierra Hamilton Joint Venture**

36.     As the initials suggest, NTGSH was formed on April 29, 2020 to be the vehicle for a joint venture between various New Tech Global affiliates and Sierra Hamilton affiliates.

37.     Each side of the joint venture contributed various assets and liabilities to NTGSH in exchange for ownership interests in NTGSH.  Going forward, NTGSH would then engage in the same oilfield consulting business previously carried out by New Tech and Sierra Hamilton, but with the combined business assets and goodwill of both companies.

38.     New Tech and Sierra Hamilton each contributed their respective consultant/operator lists, relationships, and contracts with consultants and operators to the NTGSH joint venture.

39.     In addition, NTGSH offered employment to employees of New Tech and Sierra Hamilton, including Defendants Williams and Biggs.

E.    **Defendants Williams and Biggs Work in Business Development And Are Offered Positions with the Joint Venture**

40.    Sierra Hamilton hired Defendant Biggs in 2012 to work in a business development role. Biggs remained involved in Sierra Hamilton business development until his last day of employment, on July 1, 2020.

41.    Sierra Hamilton hired Defendant Williams in 2017 to work in a business development role reporting to Biggs. Williams remained involved in Sierra Hamilton business development until his last day of employment, on July 1, 2020.

42.    As described above, Biggs and Williams were responsible for developing and maintaining relationships with consultants, and had regular access to highly confidential information related to Sierra Hamilton's consultants.

43.    Business developers could use Sierra's secure database and server network to access detailed information on all the company's clients and consultants. The secure database and server network are hosted from Sierra's corporate office in Houston.

44.    Through their employment, Williams and Biggs learned tactical information on specific operators and consultants, along with highly sensitive information on Sierra's business strategy.

45.    Given their positions of trust and responsibility at Sierra Hamilton, it was anticipated that Biggs and Williams would be a critical part of the success of the NTGSH joint venture.

F.    **Williams and Biggs Use Their Positions of Trust and Confidence to Steal Trade Secrets for Use at RigUp**

46.    In anticipation of the combination of New Tech and Sierra Hamilton, Biggs and Williams had numerous telephone, email, and in-person contacts with New Tech and Sierra Hamilton personnel in Texas.

10

47.     For example, on June 8, 2020, Williams traveled to Houston for an in-person interview with New Tech personnel.  That same day, unbeknownst to New Tech, NTGSH, or Sierra Hamilton, Williams accessed a highly-confidential customer list with no obvious, legitimate business reason for doing so.

48.     On June 15, 2020, Williams and Biggs were each offered business development positions at New Tech Global, with certain conditions, such as a background check and signing an agreement to protect confidential information and other legitimate business interests.

49.     After being offered positions, Williams and Biggs were identified as part of a transition team for NTGSH responsible for operators and consultants assigned to the Denver region of Sierra Hamilton.

50.     As part of that team, on June 18, 2020, Williams and Biggs participated in a meeting about the transition and received an email from David Rodriguez, New Tech's Director of Business Development, that included a spreadsheet identifying all of the operators and consultants, including consultant names *and splits* that would be transitioned to NTGSH.  The spreadsheet included information about consultants and operators that were both inside and outside the Denver region where Williams and Biggs had worked.  The information on the spreadsheet belongs to Plaintiffs.

51.     **That same night -- June 18, 2020 -- Biggs sent the highly confidential email list from his official Sierra Hamilton email account to his personal email address.**

52.     Biggs was not authorized to send the confidential information to his personal email account, and had no legitimate business need to do so.

53.     Upon information and belief, Biggs continues to have access to at least the June 18, 2020 email and confidential information that he sent to his personal email account.

54.     On June 22, 2020, just four days after participating in the transition meeting, Williams requested Sierra Hamilton's Director of IT put all of his Sierra Hamilton emails into a .pst file on a cloud storage account to which Williams had access.

55.     Williams claimed that the reason for uploading his Sierra Hamilton was in case he lost access to his emails during the transition from Sierra Hamilton to NTGSH.  Upon information and belief, Williams's stated reason was false and a ruse to obtain remote access to confidential business information stored in his emails.

56.     On this same day (June 22, 2020), Williams plugged a USB drive into his Sierra Hamilton work computer and copied confidential business information to that USB drive.

57.     **On June 22, 2020, Williams copied the business development spreadsheet he had received from David Rodriguez  on June 18 to the USB drive**.

58.     Upon information and belief, Williams still has and has unfettered access to the USB drive he used to steal the business development spreadsheet, as well as other storage device(s) containing confidential information and trade secrets.

59.     **On July 1, 2020 Williams emailed a portion of the stolen spreadsheet from his personal email account directly to the Managing Director - Upstream Business Unit at RigUp (Ross Rhinehart),** *with a copy to Biggs*.

60.     Upon information and belief, Williams and Biggs stole other of Plaintiffs' confidential business information that can be detected only through examination of computer devices and storage accounts in Defendants' possession, custody, and control.  For example, Biggs used a computer for work purposes that is still in his possession and that contains information belonging to Plaintiffs.  Similarly, Williams has at least two USB drives and expensed a cell phone

to Sierra Hamilton in December 2019, which is still in his possession and which contains information belonging to Plaintiffs.

61.     Williams and Biggs have delivered some or all of the information stolen from Plaintiffs to RigUp, which has knowingly accepted, condoned, and ratified their conduct, and which now employs Williams and Biggs.

62.     On July 3, 2020, Biggs sent a text message to a former Sierra Hamilton colleague who had decided to join NTGSH, in an attempt to convince the colleague to leave NTGSH and join Biggs at RigUp.

63.     Biggs specifically told his colleague by text, "Let me know if you want a change. I need a good field glass" guy to help him now that he and Williams were at RigUp.

64.     Biggs's reference to "field glass" is a particular invoice submitting software used by one of the larger operators with whom Biggs had developed a relationship as a result of his employment with Sierra Hamilton.  Biggs wanted an expert in that software at RigUp so that he could more effectively compete with Plaintiffs for consultants who worked with that operator.

65.     Williams and Biggs began acting as agents of RigUp no later than June 18, 2020, and continued to act as agents of RigUp while stealing Plaintiffs' information and delivering it to RigUp.

66.     Williams, Biggs, and RigUp, in knowing and active concert and participation with each other, have access to and are using Plaintiffs' confidential information and trade secrets to unfairly compete against Plaintiffs in the oilfield consulting marketplace.

67.     Williams and Biggs each knew or had reason to know that they (individually and collectively) were not authorized or permitted to use, have, access, or disclose any trade secret belonging to Plaintiffs except in the course of Plaintiffs' business.  RigUp knew, or had reason to

know, that it was not authorized or permitted to use, have, access, or disclose any trade secret belonging to Plaintiffs for competitive purposes.

## COUNT I

### Misappropriation of Trade Secrets (18 U.S.C. § 1836)

68.     Plaintiffs incorporate paragraphs 1-67 by reference as if set forth in full.

69.     At their great time, effort, and expense, Plaintiffs developed, compiled, and acquired trade secret information, including, without limitation, lists of non-public information related to their networks of consultants and operators.  Such non-public information about each consultant included name, work history, experience, direct contact information (cell phone and email), and the split negotiated with that consultant.

70.     Plaintiffs' trade secret information is not generally known in the industry or publicly, and is not readily obtainable by proper means by those who do not already possess it.

71.     Plaintiffs have taken reasonable steps to maintain the confidential nature of their trade secret information.

72.     Plaintiffs' trade secret information are used in interstate commerce to provide a competitive advantage for Plaintiffs against their competitors.

73.     Disclosure and/or use of Plaintiffs' trade secret information by any or all of Defendants would cause irreparable harm to Plaintiffs.

74.     Defendants Williams and Biggs were given access to and used Plaintiffs' trade secrets for legitimate business purposes only.

75.     Williams and Biggs acted as agents of RigUp when they obtained Plaintiffs' trade secrets for the purpose of stealing them and delivering them to RigUp.

14

76.     Defendants misappropriated Plaintiffs' trade secret information by, *inter alia*, stealing it, disclosing it to RigUp, and/or using it for the benefit of Defendants.

77.     RigUp knew or should have known that the information provided by Williams and/or Biggs had been unlawfully obtained from their previous employment, and that RigUp had no right to receive, view, access, or use such information.  Nevertheless, RigUp encouraged, ratified, and/or condoned Biggs's and Williams's theft of Plaintiffs trade secret information, and has knowingly received the benefit of Biggs's and Williams's misappropriation.

78.     The above-described conduct by Defendants constitutes a willful and malicious misappropriation of Plaintiffs' trade secrets.

79.     As a result of Defendants' misappropriation and use of the confidential trade secret information, Defendants have violated the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836(b)(1).

80.     As a direct and proximate result of Defendants' misappropriation of Plaintiffs' trade secrets, Plaintiffs have sustained irreparable harm.

81.     As a direct and proximate result of Defendants' misappropriation of Plaintiffs' trade secrets, Plaintiffs have suffered damages and/or Defendants have been unjustly enriched.

82.     Defendants' actions in converting and misappropriating Plaintiffs' confidential trade secrets for Defendants' own gain were willful, wanton, and malicious, and were taken with reckless disregard for Plaintiffs' rights.

83.     Defendants' actions have caused and will continue to cause Plaintiffs irreparable harm if not immediately and permanently enjoined.

## COUNT II

### Violated the Computer Fraud and Abuse Act (18 U.S.C. § 1030)

15

84.     Plaintiffs incorporate paragraphs 1-67 by reference as if set forth in full.

85.     Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, by intentionally accessing Plaintiffs' computers used for interstate commerce or communication, without authorization and/or by exceeding authorized access to such computers and by obtaining information from such a protected computer, and so causing significant damage.

86.     Defendants knowingly, and with intent to defraud Plaintiffs through their wrongful actions, by accessing Plaintiffs' protected computers, without authorization or by exceeding authorized access to such computers, and by means of such conduct, furthering their intended fraud and obtaining one or more things of value, including but not limited to significant and critical confidential and proprietary information relating to Plaintiffs' business.  Such confidential and proprietary information was exclusively Plaintiffs' property.

87.     Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, by intentionally accessing Plaintiffs' protected computers, beyond the scope of authorization granted, causing damage to Plaintiffs, recklessly or without due regard for their actions.

88.     Through his unauthorized access on Plaintiffs' protected computers and systems, Defendants knowingly, and with intent to defraud, misappropriated and caused harm to Plaintiffs' trade secrets and confidential information, and to the impairment of the integrity and availability of data, metadata, programs, systems, and other information. These actions taken by Defendants are direct violations of the Computer Fraud and Abuse Act—at minimum, 18 U.S.C. §§ 1030(a)(2), 1030(a)(4), 1030(a)(5)—for which Plaintiffs are entitled to injunctive relief. See 18 U.S.C. § 1030(g).

89.     As a direct and proximate result of Defendants' unauthorized access to Plaintiffs' protected computers, Plaintiffs have suffered loss and damages and/or Defendants have been unjustly enriched.

## COUNT III

**Misappropriation of Trade Secrets (Tex. Civ. Prac. & Rem. Code § 134A.001 *et seq*.)**

90.     Plaintiffs incorporate paragraphs 1-67 as if set forth in full.

91.     Plaintiffs provided limited access to valuable and confidential trade secrets to Williams and Biggs. Given the importance of the trade secrets to Plaintiffs, the confidential information and trade secrets were maintained with a high degree of security pursuant to the Plaintiffs' robust policies and practices, including limited access to information, confidentiality warnings, and policies against unauthorized disclosure.

92.     Plaintiffs at no point, expressly or impliedly, consented to the disclosure of their trade secret information by Williams or Biggs, or to RigUp by anyone.

93.     Williams and Biggs had a duty to maintain the secrecy of Plaintiffs' confidential trade secrets when they unlawfully acquired Plaintiffs' trade secret information and disclosed it to RigUp.

94.     Defendants illegally disclosed Plaintiffs' trade secret information to RigUp.

95.     RigUp knew or should have known that it acquired Plaintiffs' trade secret information from a source that had wrongfully acquired that information in violation of an obligation to maintain its secrecy.

96.     RigUp knew or should have known that Williams and Biggs acquired Plaintiffs' trade secret information through improper means, namely, theft.

97.     Defendants have maliciously and willfully misappropriated trade secrets by wrongfully compiling and then removing trade secret information belonging to Plaintiffs without authorization, for their unauthorized benefit and use and/or the unauthorized benefit and use of others.

98.     As a direct and proximate result of Defendants' misappropriation of Plaintiffs' trade secrets, Plaintiffs have suffered damages and/or Defendants have been unjustly enriched.

99.     Defendants' misappropriation of Plaintiffs' trade secrets has proximately caused irreparable harm to Plaintiffs. Accordingly, Plaintiffs seek injunctive relief to prevent further harm.

## COUNT IV

### Conversion (against Williams)

100.    Plaintiffs incorporate paragraphs 1-67 as if set forth in full.

101.    Plaintiffs owned, possessed or had the immediate right to possession of protectable personal property in its cell phone and all business-related confidential information and trade secrets stored on it.

102.    Because Williams has wrongfully exercised dominion or control over this property, Plaintiffs have suffered damages.

103.    Williams was obligated to return Plaintiffs' property upon the end of his employment on July 1, 2020, but failed and/or refused to do so.

## COUNT V

### Civil Conspiracy

104.    Plaintiffs incorporate paragraphs 1-103 as if set forth in full.

105.    Defendants combined together to accomplish an unlawful purpose or a lawful purpose by unlawful means by unlawfully acquiring Plaintiffs' confidential trade secrets.

18

106.    The Defendants had a meeting of the minds to misappropriate Plaintiffs' confidential trade secrets.

107.    Acting in concert and with the purpose of benefiting themselves and each other, while doing harm to Plaintiffs, Defendants took steps to and did in fact commit illegal acts.

108.    Plaintiffs suffered significant injury as a proximate result of Defendants' wrongful acts.

## COUNT VI

### Application for Temporary and Preliminary Injunctions

109.    Plaintiffs incorporate paragraphs 1-108 by reference as if set forth in full.

110.    Plaintiffs face the immediate threat of irreparable harm from Defendants' wrongdoing.  Should Defendants' conduct go unabated, they could reveal or destroy Plaintiffs confidential information or trade secrets and disadvantage Plaintiffs. Such harm is not readily reducible to dollar damages.

111.    There is a substantial likelihood that Plaintiffs will prevail on the merits, as evidence already shows that Defendants misappropriated trade secrets.

112.    Plaintiffs seek a temporary restraining order until a date set for hearing and, after notice and a hearing, a preliminary injunction restraining Defendants, and all those in active concert or participation with them until a resolution of Plaintiffs' claims on the merits. A temporary restraining order and preliminary injunction are necessary to preserve the *status quo ante*.

113.    The threatened injury to Plaintiffs outweighs any possible damage to Defendants because an injunction would simply require Defendants to return and not use Plaintiffs' misappropriated confidential trade secrets, or any information based on those trade secrets.

114.   The public interest is served by an injunction, which would protect Plaintiffs' confidential information and goodwill.

115.   Based on the foregoing paragraphs, Plaintiffs request that this Court:

a. Issue a temporary restraining requiring Defendants to immediately return all information obtained as a direct or indirect result of Williams's and Biggs's former employment with Sierra Hamilton that is within their possession, custody, or control, including but not limited to all information, files, and records that pertain to Plaintiffs' business, customers, contractors, pricing, products, vendors, sales, and projects, including such information currently existing on any of the Defendants' personal computers, external flash drives and other devices, or computers used by Defendants;

b. Issue a temporary restraining order prohibiting Defendants from directly or indirectly having, possessing, accessing, using, or disclosing any confidential or trade secret information belonging to Plaintiffs, specifically including, but not limited to, any information identifying or about consultants or operators who have associated with Plaintiffs;

c. Issue a temporary restraining order prohibiting Defendants from causing or allowing the destruction, alteration, modification, deletion, erasure, or any other change, material or immaterial, to any electronic evidence related to Plaintiffs' allegations;

d. Issue an order requiring Defendants to turn over to Plaintiffs' designated expert, for forensic imaging, all computers, storage devices, and accounts in their current possession, custody, or control that at any time contained information related to or originating from Plaintiffs' or Sierra Hamilton's business, specifically including but not limited to (i) the USB drives that Williams plugged into his work computer; (ii) the computer Biggs used during his employment with Sierra Hamilton; and (iii) the cell phone that Williams purchased in December 2019 and used for Sierra Hamilton.

e. Issue a temporary restraining order enjoining and restraining Williams and Biggs, and those in active concert or participation with them, from directly or indirectly contacting, soliciting, selling, or inducing any consultant or operator with whom they had contact on behalf of Plaintiffs and/or Sierra Hamilton;

## IV.   RELIEF REQUESTED

116.   Plaintiffs seek the injunctive relief described in its Application for a Temporary Restraining Order, Preliminary Injunction and Permanent Injunction.

117.    Also, as a direct and proximate result of the Defendants' actions, Plaintiffs have suffered  and will continue to suffer actual damages. These damages include, but are not limited to: (a) lost  profits; (b) lost goodwill; (c) incidental damages; (d) consequential damages; (e) mitigation costs; and (f) out-of-pocket expenses. Plaintiffs seek compensation for these damages.

118.    Plaintiffs should be awarded exemplary and/or punitive damages because the Defendants acted with malice, knowingly, and in bad faith.

119.    Plaintiffs demand trial by jury of all issues so triable.

120.    Plaintiffs pray that, upon final trial or hearing, Plaintiffs be awarded:

a.  The temporary restraining order, preliminary injunction and permanent injunction described in the relevant applications for injunctive relief;

b.  Actual damages;

c.  Exemplary and/or punitive damages;

d.  Pre- and post-judgment interest;

e.  Attorneys' fees;

f.  Costs of court; and

g.  All other relief to which it may be entitled.

Respectfully submitted,

*/s/ Charles Jeremiah*

**CHARLES T. JEREMIAH**
State Bar No. 00784338
Southern District No. 15222
**HOLLAND & KNIGHT, LLP**
1100 Louisiana Street
Suite 4300
Houston, Texas  77002-5227
Telephone: (713) 821-7000
Charles.jeremiah@hklaw.com

**PETER N. HALL**

*Motion for admission pro hac vice forthcoming*
Georgia State Bar No.: 141376
**HOLLAND & KNIGHT, LLP**
1180 West Peachtree Street, NW, Suite 1800
Atlanta, Georgia 30309
Telephone: (404) 817-8412
peter.hall@hklaw.com

**ATTORNEYS FOR PLAINTIFFS
NTGSH JV, LLC & NEW TECH GLOBAL
VENTURES, LLC**

## <u>VERIFICATION UNDER 28 U.S.C. § 1746</u>

I, Keith Grimes, former President of Sierra Hamilton Holdings Corporation and current Chief Operating Officer and Secretary of NTGSH JV, LLC, hereby declare and verify under penalty of perjury under the laws of the United States of America that I have read and considered all the factual allegations of this Verified Complaint and that such factual allegations are true and correct to the best of my knowledge and information.

Keith Grimes
Chief Operating Officer
NTGSH, LLC